Thank you, Your Honor. Good morning, and may it please the Court, I'm Palmer Foray, representing the appellant plaintiff, Mr. Rapley, in this case. I'd like to start with addressing the purpose of the 1966 amendments to the Federal Tort Claims Act, which of course set up the whole limitations of both the two years and the six months. But I think most importantly, and that statutory amendment also started the whole administrative review process. And I think it's important for us to talk about why Congress introduced the administrative process in those 1966 amendments. And the best explanation of that is given in the government's brief in this case in footnote 4 on page 14. And the government very quite frankly says that the presentment requirement allows the agency with the best information to consider and resolve the claim without the need for filing suit and possibly expensive and time consuming litigation. And they cite to the U.S. Supreme Court McNeil case. So when we discuss the issue of yes, the statutory scheme does allow a claim to be brought, or an action actually to be brought, after the administrative agency has had six months to review it. The reason not to bring a claim or bring an action after that six month time period is exactly why Congress passed the presentment slash administrative process. They wanted to try and have cases resolved without time consuming and expensive litigation that takes up the most time. And the longer that process goes on, the better chance there's going to be that there's going to be a settlement of this case. So that is why many, many times and particularly in both of these cases before this court that there was a period of time of some four years in both Lucas and my case of letting the agency try and look at the case and resolve it and therefore not to proceed with bringing an action after the initial six months. And I also want to talk just a little bit about bringing an action because 2401B, that's the language in the statute, that once a denial letter is submitted or mailed by the administrative agency, then the plaintiff must bring an action within six months of the date that that letter is mailed. It does not say bring an action in district court. Now certainly many cases that do not involve this Maryland process that is involved in these cases, many appellate cases in the Supreme Court in Wong certainly talk about bringing an action in district court. But those cases do not involve where there is a mandatory substantive requirement to bring an action first before bringing in district court. Except, you know, section 1346 says that any such action has to be won in a Federal court because that's an exclusive place you can bring an action against the United States. There's no question that eventually Not eventually. When you bring an action against the United States, it has to be in Federal court. Except that under the circumstances of these cases in Maryland, you have to first bring that action in the Maryland, I call it the health care office. So I'm just trying to construe 2401B. And if you look at 2401A, it gives the longhand for the action used in B and it talks about a civil action. But I don't think there's any doubt in the courts that action means a civil action. You have to bring a civil action within six months after the mailing. That is correct, Your Honor. I absolutely agree with that. But what I'm saying is, is that when you have this whole imposition of the Maryland health care slash arbitration process imposed on a plaintiff in Maryland, which we absolutely have to file in the Maryland health care office, I do not – that is not in dispute. Well, let me ask you, in this case, you complied with the – you could have complied because you filed with the State arbitration mechanism five months after. It's roughly five months. Five months after the letter we did not know about, but correct. Yeah. And – but you didn't file your certificate of the expert or the waiver. How much longer after that? How long did it take you to get the certificate for the expert? The – the health care case was filed in November, and I believe the certificate and report was filed, as I recall, in March at that time. February. Or February to March. And did you file a waiver with it? In March. We filed a waiver in March. Correct. Correct. But – and, of course, all of that is allowed under the Maryland statutory scheme. Oh, anything's allowed. The question is, are there time limitations for everything, though? The time limitations for the Maryland health care scheme allows those time – in other words, we were in compliance with the Maryland time schemes for filing everything we filed in this case. That's all I'm saying. How long was your claim before the agency? Approximately – it's a similar time as in Lucas. Our claim was filed approximately four – approximately – not quite four years. It was slightly less than that. And when did you get your expert? Did you do nothing during those four years? No. There's actually evidence in this case that the – I did not become involved personally until March of – right before the case was filed in district court. But there's evidence in this case that the expert's report was done in January of 2011. He was, of course, contacted well before that, and that just resulted in a written report. And then you also have to get a certificate to file with a report under the Maryland scheme. The certificate was not done until around the time that both the certificate and report were filed in 2013. But let me also talk – Judge Motz, you asked a question in the prior case about whether or not the Maryland scheme is mandatory. And under the statutory scheme that we work on now in Maryland is the third, let's call it, version of it. And when the whole arbitration scheme started, I believe, in 1976, arbitration was mandatory and no side could get out correct. And so under that scheme, granted, it's not the one we're talking about today, but the government's arguments about bringing an action would certainly have applied back when arbitration was mandatory. And so the plaintiff would have no option under that statutory scheme to waive out. And so what would most likely have happened is that the case would be filed against the government and the government would file the appropriate motion to – or remove it to federal court. But that was not – but under that scheme, the plaintiff didn't have the option. And under the second scheme of the Maryland statute, where I call it – both sides had to agree to waive. So again, that would not have been an option for the plaintiff merely to waive out. Both sides would either have to agree or probably what would happen is the government would remove it because it does have to. But we're applying different law now. I mean, law changes all the time, right? And we apply the law that applies. We don't go back. I'm just saying that my position is the reason that 2401B says bring an action and not bring a district court action is to cover situations such as what I'm talking about, where the only conceivable way to do it is to bring an action under the Maryland arbitration schedule or law and then the plaintiff has to wait until something is done to get it to federal court. I am submitting that Congress had the foresight when they passed the amendments in 1966 to say bring an action for the very reason that we're here for before the court today. And the legislative history of the 1966 amendments does have some implications. Some references in discussing the statute about bringing an action in district court, bringing a court action. And the eventual statutory language does not contain that. Section 1346 does. 1346 does. Section 24A talks about a civil action and the Supreme Court referred to the action that we're talking about to be an action in federal court. The Supreme Court in Wong. Yes. First paragraph of Wong. Absolutely. But there was no that didn't involve any other option other than you would immediately go to federal court because of the nature. I don't think you can take much from it. I agree when the Court said that. But basically, it was reciting what seems to be somewhat obvious from the statutory language, that Congress was talking about bringing an action. It had to be against the United States in federal court, because that's the only thing you could do under 1346. Except that, what I am saying, and without risking, but I guess I am repeating myself, is that when Congress did 2401B and did not set court action, I think they actually had the foresight of predicting that something like exactly what we're here for today might occur, and therefore, it would have to start in Maryland. That's bringing the action and make its way to federal court to comply with 1346 and that. So, are you jettisoning your Maples argument? I thought that's what we would only hear about. No. My Maples argument has to do with equitable polling. Right. Right. And so, if the Court is not going to agree that bringing an action in the Maryland then I'm submitting that equitable polling applies in my case, primarily for two reasons. The Maples argument, certainly, the facts of this case, the facts of Rapley, I think, are very, very similar to the facts in Maples regarding the abandonment issue. And I'm free to make that argument before this Court, because I was not involved until much later in the case. There's some comments in Maples about there being a conflict, and at least for me, there's not a conflict because I wasn't involved until... Well, your firm was. The firm I am with now was. That is correct. Well, they choose, at least my dealings with firms are that they choose who represents. So, it's like they can't just go find and hire a new lawyer and say, therefore, there was no, there's no connection. Correct, but... That certainly can't be the law. But, interestingly enough, Judge Weiss, that's what's happened in Maples, that Maples, that Sullivan and Cromwell remained... Have you looked at the cases that have relied on Maples? I'll confess that you probably know them maybe better than I do, but... I'm just asking if you've looked at any of them. Very briefly. What I've concentrated on were the facts in Maples. Right, and it sort of gave me pause. But the courts that have interpreted Maples seem to say that it's confined to habeas situations and habeas situations involving the death penalty, because it's a pretty extraordinary departure from earlier law about equitable tolling. Now, there is one case that is not that field, but it's a little unusual, too. And since you haven't read them, we don't need to discuss that. But I was just saying that I think it's hard to press Maples into this situation when you think the facts are similar, but there are a couple of critically factual differences. The critical, being what Your Honor is saying is that, you know, there is a penalty involved, and the cases you're talking about, you know, are limiting it to that. I'm just saying that Maples itself does not so limit. And the other... It's even a suggestion in some of these courts, well, in civil cases, distinguishing them from habeas cases involving a criminal, underlying criminal case, you have the person that is injured has a malpractice client. Correct. So they have another way out, so that equitable tolling isn't necessary. As indicated in our briefs, though, I think the issue of equitable tolling does need to focus merely on whether or not the Federal Tort Claims Act case can go forward. Because saying that there's this factor of a malpractice claim is another issue that may or may not ever provide a remedy to the plaintiff. So that if we're going to, since the Supreme Court in Wong says equitable tolling applies to these cases, we need to decide whether... But if there was equitable tolling for the reasons that are set forth in Maples, that is abandonment by the lawyer of the client, then it would seem to me that there would be a malpractice claim. It would be a whole separate process. Of course it would be a separate process. That would require expert testimony. But we're just talking about would the client have another avenue to recover? That they wouldn't if they're capital habeas. All we can say is possibly yes, and obviously the distinction being from a capital habeas case. But the other reason we ask the Court to apply equitable tolling in this case, in the Rapley case, is because we never received, and this is not in dispute, we never received the denial letter. The denial letter that was sent in June of 2012... What prompted you to go ahead and file your claim? The claim was filed with Maryland Health Care Office in November because by that time... I mean, again, I didn't file it, but I'm fairly certain I know why it was filed. And by that time, enough time had passed so that the conclusion was reached that the government was not going to settle the case. I think by that time it had been over four years. And so it was... So if you knew then, why didn't you know about the deadline? You knew something's going on in the case, right? We decided on our own to file with the Maryland Health Care Office. We did not know, which we could, you know, which you can do after six months. This was much later than that. We did not know and had absolutely no idea that the government had officially denied the case, which is what triggers the six months running. So... And that's what gets close to the Maples case because it's the same thing happened. The law firm said the notice was delivered, but they returned it because the lawyer that had been working on the case wasn't there anymore. And that's the situation here, right? Well, no, actually in Maples, the local council in Alabama actually received the notice. Yeah, I know, but I'm talking about the fact that the New York firms were on the hook. Correct. The same thing happened. But in this case, we had absolutely no knowledge that... But they had no knowledge. Exactly the same thing happened. All right, all right. One example of Maples, of this case being maybe even more extreme than Maples, without discussing that it was a habeas death penalty case, is that they received actual notice and in Radcliffe, we did not. They didn't... The New York court did not. The New York court says the record was that local council was never going to do anything more. So he got actual notice, but the New York law firm got exactly the same notice as you got here. Correct. The notice is sent there and then returned because the lawyer is no longer there. Right? Correct. Okay. Correct. All I'm saying is the distinction being that somebody in Maples on part of the criminal defendants side had received notice. I've gone over my time, but I'd like to save a couple of minutes. All right, we'll see you back for a few minutes. Mr. White. Thank you, Your Honors. May it please the Court, Neil White on behalf of the United States in this case. I think I would like to begin where we ended with Maples. And I think there are some very significant distinctions between what happened in that case and the facts of this case. Of course, in Maples, we're dealing with whether or not you can excuse a procedural default under state law for purposes of habeas. So in Maples, the Supreme Court's examining a 42-day period under Alabama law to appeal a trial court order on post-conviction relief. And of course, as you know, the Supreme Court found that not one of Maples' three attorneys of record were actually serving as his lawyer, but critically during that 42-day period. If we apply that to this case, what's important is, did Mr. Rapley have functioning counsel of record in the six-month period after HHS denies his claim, but before he's required to file it in federal court under the FTCA? But unlike Maples, both before, during, and after that six-month period, the record evidence shows that we do have Ashcraft and Jarrell counsel working on the case. Please the Court, I'll briefly run through these facts. We know the surgery that caused the injury occurs in September of 2006. We know just a few months after that, in November of 2006, Mr. Rapley hires the law firm of Ashcraft and Jarrell to handle his case. In just a day before the two-year statute of limitations under the FTCA was about to run, Mr. Turpus, on behalf of Mr. Rapley, files his administrative claim with HHS. They send him an acknowledgment letter right away in September of 2008. The acknowledgment letter also points out to him that after six months, you can go to court if you want, you don't have to wait this out, and generally gives him his advice under the FTCA about timeliness. Mr. Turpus sends records almost eight months after that, in response to the request from the agency. And then we know that in May of 2010, we know this because the district court at the February 2014 hearing asked counsel about this, and they agreed, that Mr. Turpus left the law firm of Ashcraft and Jarrell in May of 2010. This is in the transcript at JA 151 and 152. And then, about six, seven months after that, we know that Ashcraft and Jarrell receives a letter from their expert, and it's addressed to an attorney named Wayne Mansula. So, after the alleged abandonment, but before HHS denies the claim, we have another Ashcraft and Jarrell lawyer that's working on the case. We know in June 2012, HHS mails this final denial to Mr. Turpus at the correct address. The district court found it was the correct address. There was no other place. Judge Grimm said there was no other place to mail it to. And then, in October of 2012, we know the Certificate of Merit is signed. We're all still in the six-month period now. On November 8th of 2012, Ashcraft and Jarrell, through another lawyer, this time Joseph Musso, files a statement of claim with PACADRO. Again, we're still in the six-month window. And then, a month after that, the six-month window expires. But Ashcraft and Jarrell, without notifying HHS, continues along in health claims. They file the Certificate of Merit in February of 2013, even though it was signed back in October of 2012. They wait another month to file the waiver out of the PACADRO process, this time again by Joe Musso. And then, only three days after that, of course, PACADRO issues its order of transfer. But they wait another two months before coming to Federal court on May 3rd, 2013. So on the way to the do agencies ever reissue denials? Are you aware of any instances where that's happened? I'm certainly aware of the instance where the claimant asks for reconsideration, and then the agency takes it back. And that triggers another six-month period, either to deem and deny it and go back to court, or allow the agency to rule, and then six months again from the denial. I can't speak to the issue of whether they'll simply reissue it. Do the reconsiderations typically occur within the initial six months? Yes. You're required to file that first one, I believe, within six months. Although that could be a product of agency regulation, but I believe they're all pretty standard and based off the DOJ reg, and it's six months. So again, in Maples, the replacement Sullivan and Cromwell attorneys didn't jump into the picture until after the deadline was already passed. They made some reference in the record that they were working on the case, but they never provided an affidavit or anything to say what they were doing. And I think, you know, that's the case here, too. I mean, the allegation is that Turpus walked off in May 2010 and left poor Mr. Rapley abandoned. But we don't have anything for Mr. Rapley in the record. We don't have anything for Mr. Turpus in the record explaining precisely what happened. And again, since it's their burden, you know, their failure to produce that kind of evidence I think is significant on the question of whether or not they can show abandonment. Of course, as the Menominee case made clear, even if they could show some extraordinary circumstances, they also have to show reasonable diligence. And based on that timetable I just went through, which I don't see the need to repeat, that's not reasonable diligence. You're essentially allowing a claim to stay with the agency, even though you can deem it denied. And I've cited you a couple of district court decisions that have said for that reason alone, if you don't deem it denied and go to Federal court after six months, and then you subsequently miss the deadline, you can't rely on equitable tolling to save you because that's just not diligent. You know, and the diligence prong is obviously reasonable diligence. It's not maximum feasible diligence. But it's the diligence in actively pursuing your judicial remedies. So although the statute and the scheme may allow you to, for whatever strategic decision you think it may be helpful to let it sit there for years and years and years, when you're asked to show your reasonable diligence, you have to show some effort to get to court in a reasonably prompt way. And on this record, I don't see how they show that. I did want to touch briefly also staying on the equitable tolling piece with respect to this notion that HHS somehow committed wrongful conduct or induced the missed limitations in this case. It is true and we do not deny that HHS counsel duly mailed via certified mail the denial letter to Mr. Rapley's counsel of record at the address he provided. It was an address they had used previously to correspond, and Mr. Turpass responded when mail was sent to that address. We do know that it came back. We do know that it came back unclaimed, and we do know that agency counsel took steps to verify that it was the correct address but did not resend it, did not make phone calls or anything of the like. But we submit that that is precisely what the FTCA and HHS's own regulation specifies the process. And to require more of them is essentially changing the statutory construction to say that that's equity. Is there anything in the regulations or practice or anything about counsel informing you that there's been a change of counsel or withdrawal? I don't think they have a specific policy like a lot of courts do. I mean, the closest analogy is almost every district court and I'm sure the Court of Appeals has a local rule that says counsel and pro se litigants must keep a current address on file with the court. And the failure to do so, frankly, can result in the dismissal of your case. I don't know if they have anything formal, but obviously, you know, and Judge Grimm seized upon this as well, it just makes sense because if you know the only way you're going to get notice of your certified mail, you need an address and you need a right point of contact to send it to. I don't know if the Court is interested in hearing even more about the Hacadro situation. I'm happy to answer any questions on that point. I think the only thing that hasn't gone forth in the previous argument and before is the sort of notion that, I mean, plaintiff does not come forward with any case that actually holds from any jurisdiction, any State malpractice regime reform, anything that says you can now change the language of a Federal statute to incorporate this part of the State's limitation provision. On the other hand, we now know at least in the District of Maryland, we have five separate judges in six different cases, including this one and including Lucas, that have reached the opposite conclusion. They all say that an action is begun when it is first filed in Federal court. And again, as we talked about before, the reasons for this, it's a Federal statute with Federal limitations. Judge Davis, you were on the panel in Anderson. You clearly, you know, the panel clearly held that if there's a State limitations provision and if it conflicts with the Federal one, the Federal one preempts it and controls. Perhaps more importantly, and I think Judge Niemeyer, you touched on this, is the statutory context here. If 1346B, which is the jurisdictional grant from Congress, says the only place to bring an action is the Federal District Courts, I'd also note that 28 U.S.C. 2402, which what we like to refer to as the one that precludes jury trials, simply says any action against the United States under 1346 shall be tried by the court without a jury, which further underscores the point that Congress only intended for an action to be brought in Federal court. As Judge Grimm himself recognized at the hearing, you know, one of the principles underlining this is uniformity. It would be nearly impossible for Federal agencies to keep track of all of the different malpractice reform regimes out there, figure out whether they're mandatory, permissive, substantive, procedural, and figure out what to apply in any given case. So unless there are further questions. Do you think this case would be any different if the notice had been sent to Ashcroft and Garrell? Is that how you say it? Ashcroft and Jarrell, I believe. Ashcroft and Jarrell, and Mr. Trippeth, and not been sent back? If it had been sent to two mailings? No, no, no. One mailing, but sent to both, in other words. Oh. You know, I don't know. Obviously, that would be speculation. Ironically, you may be correct that had they sent it just to the firm as a to-it-may-concern type of thing. No. They sent two names. In other words, not Diana Motz at Covington & Burling, but Covington & Burling, period, Diana Motz. I was never at Covington & Burling. I'll just pick it up. I would be engaged in speculation to, you know, suggest what the results would be. If you had put at the – if they had put on the claim two names, which they didn't here. No. It's just his name and then the firm. No. It's not the firm. It's just the firm. It's not the firm on the claim. It's just his name. Yeah. The claim is just the firm. Okay. By Trippeth. No. The letter is the firm by him. But the claim, at least what I'm reading at A440, I don't know. It's handwritten. That's Trippeth's signature. Sorry. Which page you're on? I'm looking at A40. I don't know whose signature it is. I would suspect in Block 13A that that's Mr. Trippeth's signature. Yeah. That's what I would suspect, too. Counsel for John Rapley. So he doesn't say anything about the firm there. What about the previous page, 39? 39 is the letter. Yes. I said on the letter they have that. Isn't that the claim? Well, I thought the claim was the thing that's on 40 and 41, the claim. I believe the claim submission as a whole begins on A35 and rolls through A44. So when they submitted the original claim, they included two cover letters, and the second cover letter on A36 says this law firm and the undersigned attorney have been duly retained to represent Mr. John Rapley. And then there's the claim form, as you pointed out, at A40, and then they're actually attached their retainer agreement. They do that to show that they have the capacity to present the claim on a representative behalf. And, again, he says, I retain Ashcraft and Jarrell to represent me. So from where do they attach that to the claim? Yes. I believe they attach that to the claim, at least that. From where did they get the address is, I guess, what I'm you know, you say in the normal course they send it back to him. They didn't send it to Ashcraft and Jarrell. My belief is from A35, the cover letter, the main address of the firm is 1 Central Plaza in Rockville. And that seems to be the address that they then sent the acknowledgement letter to at A45. And the denial letter at A48. So, you know, it's a very interesting question. Had they just put the firm and not Mr. Turpus, although that's somewhat contrary to standard mailing practices, you usually think if you put the person's name, you've got a better chance of it getting there. But had they did that, it may well have resulted in more investigation by the firm upon its arrival. But as Judge Grimm suspected, and, again, I don't think he was saying the most likely explanation here is the postal employee walks into the law firm with a certified mailing for someone who's no longer with the firm. And he was probably told he's not there anymore. And that's, Judge Grimm suspected it was the postman's writing, no longer at this address, unable to forward. And that's why it was mailed back to HHS. So they would have received it if it had not been sent certified mail return receipt request? It's certainly possible. Well, any law firm would open the mail that comes in the door. Right. And I've had other agencies, and, again, these are all things that are done. Again, I don't believe they're required. But, you know, sometimes they send one by certified mail and one by regular mail. I was actually going to ask you that. Would the employee in this case have been in trouble if, upon receipt of this return mail, someone picked up the phone and called the firm and said, hey, guys, you know, we've got this denial letter that's just come back here. Are you aware of instances of that actually happening? You've been doing this a while. Of the agency counsel being disciplined for doing more. Or, better, calling. No. Directing an administrative person to say, hey, look. I have not seen that. But, again, I have seen a variety of agency responses on these things. Some, you know, make efforts beyond what the statute and regulation require. But at a minimum, they have to send it certified mail or the denial isn't effective. Right. Whether they choose to do alternative means of notice, I think that's sort of at their option. And on that point, you know, it's not the case that every person that files a claim with an agency intends to litigate it. Sure. And in this case, you know, they sent medical records in 2009, and according to the affidavit from agency counsel, they never heard from them again until they denied the claim in 2012. So it wasn't the situation where we had active correspondence back and forth and they had a personal relationship and, oh, hey, by the way, we denied this. You know, this was, you know, years past. So how long, why does it take so long then if nothing was happening? Well, from the agency's perspective, you know, this is a surgical malpractice case that involved, I think, a rather specialized surgery at the NIH. You know, Mr. Rapley had some genetic issues that required a parathyroidectomy procedure. So it's typical agency practice, at least at HHS, that they have to retain a doctor to perform a medical review. So a lot of times they can get a doctor from inside the system, but it takes a long time, I guess, to identify the doctor, get the records, send the records, have the medical professional review the records, and then give the agency some understanding of what the medical issues are and whether or not the claim has merit. And you have to factor in that this is a government bureaucracy. One of the best, yes. They maintain a lot of facilities in Maryland, and some of them, as you may know, especially at NIH, much of it's devoted to scientific research and not so much, you know, run like a regular hospital. So those may be factors as to why there's a delay. But, again, when there's a delay, if a claimant wants to get to court, he or she has to wait six months and a day, and, you know, they're the master of the claim at that point. So if there are no further questions, I will yield. Thank you. Mr. Gray. On equitable tolling, the first thing the Court has to consider is has the plaintiff diligently pursued his rights. We've discussed a lot today in both cases, this and Lucas, about the administrative process and how long it takes. And I just want to emphasize that the reason for that administrative process and the reason for the length of time that it can sometimes take is to, as I read before from the government's brief, that the purpose is to try and get cases resolved at that administrative process, get them settled without costly and time-consuming litigation. And so I respectfully submit that a plaintiff diligently, maybe not maximum feasible diligence, but reasonably, diligently pursues his or her case when, by letting the government agency have whatever time is needed to get the expert review that. I think you've got no problem there. What about extraordinary circumstances? The extraordinary circumstances in this case are or it's either defendant's wrongful conduct and or extraordinary circumstances. And so I submit to you, Judge Davis, that the wrongful conduct in this case is that. Are you talking about the agency's conduct? Yes. What did they do wrong? They absolutely knew that this denial letter had not been delivered. They knew it had been returned unopened. They knew it had been returned with the handwritten notation, no longer at this address. There is no dispute that the agency knew their denial letter did not get. But what were they supposed to do? What made it wrongful? It was wrongful because once they knew, once they absolutely knew. Right. No longer at this address. That or that no one had seen the denial letter. Uh-huh. I think most importantly. You know, you practicing law when Judge Harvey was around? Yes. So I was one time in court where somebody was making a similar argument. And he said, well, what do you want me to do, run around after them? I mean, what is there no longer there? What are we supposed to do? In, you know, in either the, some of the cases cited, I think, by both sides, Zander and Misrach. In one or both of those cases, more than one letter was sent. But to directly answer your question, Judge Motz, in this case, when they, you know, in these other cases, sometimes it's not clear what knowledge the government had regarding the denial letter.  They knew it. That point is granted. The government knew that it was not delivered. But now, what did it do wrong? They had. At that point, did it have any other duties? Yes. What? They had several options. Probably the easiest. But, Judge, you might have said duties, not options. They had, under equitable polling principles, they had a duty to, once knowing that no one knew this letter had existed, in effect, then they had a duty, under equitable polling principles, to either send the letter again, pick up the phone and call, or do make sure that the, that my side, that the plaintiff. Well, taking his point of view, he's sitting there. He's in the agency. He did check to make sure that where they sent it was the address of the firm, confirmed that it was accurately addressed, and went to the firm and was turned down. It seems to me now his next conclusion is, well, where did Turpes go? And now the question is, what do we ask him to do to find out where Turpes is? That's what we send to Judge Harvey. Or, or, all right, or, at A47, it's Mr. Turpes' letter sending the medical records in June of 2009. Now, the way the letterhead works is there's always, you know, one address that's in the middle, and then the other addresses are smaller and underneath that. The first, the claim form that you were talking about, Judge Matsch, the cover letters there had Rockville. The letter sending the medical records at A47 has the Alexandria, Virginia address. So upon realizing that absolutely no one got this denial letter, and upon knowing the agency that the six months now in their mind was ticking, they could have sent it. No, they don't think about that at all. They just discharge their duty, which is to send it by certified mail to the address they had. And in this case, he went one step further, which was to confirm that he had done correctly, that that was the address. Now the question is, what's the next step you would have that agency employee do? And it seems to me the next logical step would be to find out where did Turpes go, and is that something we're going to impose on the Federal government? I, I, I submit, Your Honor, that the next logical step would be, would be sending to the other address, because they had that. So when they, when they were. The file's not in Virginia. The file's in Rockville. Well, no, no, no, no, no. The, the, the, the, the, the, the letter was sent by Mr. Turpes on the Alexandria, Virginia address because he, he at that point in time was there, and the file was there. But I think all from the government's point of view, when they realize that no one has received this letter, nobody on our side knows about it, they can resend the letter to Alexandria, Virginia. Okay, and so the Alexandria says he's no longer with us. Well. Now what do we do? If, if the letter had been sent to Alexandria where it is my understanding the file was located at that time, then conceivably the letter would have been delivered and we would have known about it. It would say, it would say we have a mail. We're following Judge Grim's scenario, which is not unreasonable. We have a letter here for Mr. Turpes. He has to sign for it. Mr. Turpes is no longer here. Postman puts no longer here and goes. Right. I, I, I, once knowing that the, I mean, I mean, the government agency, Your Honor, does know that the six months is, is running. They know, but that's not their concern. They're not worried about the six months. They're worried about discharging their duty of mailing certified mail to the person. Now, they did that. They confirmed that they did it correctly. Now the question is, they now learn that it didn't get there. What's the law require them to do? So the duty is to either send it to Virginia or call, call the firm and say we have a denial letter. Where should we send it? And I think. Well, I called the firm. Turpes is no longer there. He's the guy who's handling it. He could have taken the file. Then when they make that phone call to the firm, they will, they will learn whatever the situation is. I mean, we know he did. Well, the situation is it stayed there in Ashcroft. That's Ashcroft, but that is correct. And, you know, I mean. You don't, you don't deny, just to pin this down, you don't deny that the firm should have received that letter and opened it, that envelope. You don't deny that, do you? I submit to your honor that the letter. I submit that we don't know what happened when that letter arrived in Rockville. A law firm. Other than what was written on it. A lawyer leaves a law firm and a certified letter from a government agency arrives. Is it your position that the standard of care is to send it back? My position. I will. And I don't want to get you in any difficulty. You're not getting me in any difficulty. I said that. I'm just surprised that you're not. I'm not. No, I'm agreeing with your honor. Okay. That if the letter actually gets to the firm, if it gets inside the suite door, then. Where do you think it went? Well, that's what we don't know. Because the handwriting, as Judge Grimm decided, the handwriting on the letter was not anyone in the firm. It could have been the mailman. The mailman. It's exactly what Judge Grimm said. And it very well could have. He goes in and there's a letter from the agency to Mr. Turpus at this law firm. I need his signature. Or somebody's signature. Or. Somebody's sign off. Or the mailman knew he wasn't there because he hadn't been there for a while. Well, you know, wouldn't it be your burden? I mean, wouldn't you have to depose somebody or offer a deposition? Or you would show that this mailman was corrupt and he was doing this right and left? The mailman's not corrupt. The mailman's not corrupt. And it's for the mailman to do what you say. You know, we're going to give him that presumption at this point. I don't want to call the mailman corrupt. Good. All right. But what I am saying is. You may not get your mail for a while. Sometimes we have that difficulty anyway. But what I am saying is this. Suggesting he's overly helpful. What I'm suggesting is that we just don't know. And maybe he was overly helpful. But what I'm really saying, what I'm really saying is this. What I'm really saying is that, you know, we cite in our reply brief to the Kelly case from the Second Circuit. And it says that, you know, the government cannot lull plaintiffs into a false sense of security when there is a time limitation running on them there. What I am saying is this. Is that if there's any case for equitable estoppel, that the case is when the government knows that a denial letter under the Federal Tort Claims Act case has never gotten to the plaintiff and or his lawyers. And it comes back to them unopened. The duty on the government is to either send it to another address, which has been done in some of the cases, or call. Where do you get this duty? The regulations are pretty specific as to what they're supposed to do. I get the duty primarily from the Kelly case and other cases similar to that. We've only cited Kelly where when this, when these events occurred and the government. What does Kelly case say? It says that the court concluded that the government could not lull plaintiffs into a false sense of security by waiting until plaintiff's time to file an administrative claim had expired and thereupon moved to be substituted and to dismiss. And what. Yeah, but that's no lulling here. It's lulling here because they know the letter hasn't been received. It was even unopened. They know it never, nobody, they knew, government knew. I'm just trying to say that that case is not applicable unless you have some active lulling on the part of the government. If the government took some act to defeat the claim with knowledge or said this will get them, I think your case is 100 percent sure. But I sense the agency not only didn't do that, they did what they legally required, but they took the extra step to see, look up the address of the firm and see if it was the right address, and they confirmed that it was. Well, my understanding is when they looked up the address, they just confirmed that there was an ad that the Rockville address was in their files as we've just. But it's the only address they had in the files. Well, no, they had the Alexandria address. And you predict that the delivery at Alexandria would have been different than the delivery in Rockville? I predict that that is certainly, could have happened, yes. But more importantly, more importantly, I am saying that the lulling in this case is that the government knew in this case that those six months, they know the six months. Don't you think lulling has a pejorative? It's an active verb in this, the way that Kelly's case used it? It is. It can be. It is an active verb, and that active verb can be met by the failure not to do something, is what I'm saying. Okay. I think the facts in Kelly are similar. All right. Thank you, Mr. Beret. Thank you. We'll come down and re-counsel and adjourn for the day. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Andre M. Davis